# EXHIBIT C

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 16

Case: 1:22-cv-05185 Document #: 10-3 Filed: 09/23/22 Page 2 of 13 PageID #:241

FILED
9/16/2022 3:39 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022CH09197
Calendar, 16
19530969

FILED DATE: 9/16/2022 3:39 PM    2022CH09197

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| CITADEL SECURITIES AMERICAS SERVICES LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 22CH-09197 |
| VINCENT PRIEUR, | ) ) |
| Defendant. | ) ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS
EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Citadel Securities Americas Services LLC, an affiliate of the global Citadel Securities group of companies ("Citadel Securities"), respectfully requests the immediate intervention of the Court to maintain the status quo pending mediation of the underlying dispute pursuant to and in accordance with the parties' Mediation/Arbitration Agreement. On March 18, 2022, Defendant Vincent Prieur resigned from his position at Citadel Securities. On September 9, 2022, Prieur informed Citadel Securities that he had joined a new employer, Portofino Technologies ("Portofino"), a competitor of Citadel Securities in the cryptocurrency ("crypto") space. Prieur's employment with Portofino is a violation of his Non-Compete Agreement with Citadel Securities. Citadel Securities' valuable and proprietary confidential information is at stake. Citadel Securities will suffer irreparable harm if Prieur is not enjoined immediately. Accordingly, Citadel Securities' motion for a temporary restraining order should be granted.

**BACKGROUND**

**A.     Citadel Securities' Business**

Citadel Securities is a market-making firm across a broad array of fixed income and equity financial products, including for retail and institutional clients. (Citadel Securities'

1

FILED DATE: 9/16/2022 3:39 PM 2022CH09197

Verified Complaint for Injunctive and Other Relief ("Compl.") ¶ 13.) Using proprietary intellectual property and highly skilled personnel, Citadel Securities trades equities, options, derivatives and fixed income products for its clients, including asset managers, banks, broker-dealers, hedge funds, public pension programs, and government entities. In so doing, Citadel Securities provides needed market liquidity and efficient pricing. (*Id.*)

Citadel Securities engages in many aspects of trading, including in the crypto space. Citadel Securities' activity in the crypto space is an important and growing source of profit for the company, and the company invests heavily to develop and support it. (*Id.* ¶ 14.) Citadel Securities has spent millions of dollars hiring and compensating highly educated personnel who work on its crypto, market making, and high frequency trading efforts, and the company makes substantial investments in technology, research, and other infrastructure to support its employees who work on those projects. (*Id.*) Importantly, the profits from Citadel Securities' crypto efforts can decline over time if more people or entities compete with Citadel Securities by employing strategies and efforts similar to Citadel Securities' strategies and efforts. To avoid this, Citadel Securities takes extensive measures to maintain the secrecy of its crypto strategies and efforts, and to protect them from being exploited by third parties. (*Id.*)

Citadel Securities has spent a significant amount of money and resources to build a business, which it continues to expand outside traditional asset classes and across the crypto spectrum. (*Id.* ¶ 15.) By March 2021, Citadel Securities was actively researching and planning to trade crypto beyond derivative products, developing the underlying infrastructure and strategies to do so, and creating and gathering confidential information in the process. (*Id.*) A year later, in March 2022, based on that confidential information and investment of resources in planning and operations, including building its crypto trading stack, Citadel Securities' affiliate in Asia

FILED DATE: 9/16/2022 3:39 PM 2022CH09197

executed its first systematic crypto trade. (*Id.*) That trading has continued and grown since, and Citadel Securities' plans to trade crypto in the United States and other parts of the world continue to progress. (*Id.*) Furthermore, the company is involved in a business initiative with external institutional investors to develop a crypto trading ecosystem, and also trades a wide array of products, including derivatives, that are directly competitive with crypto and fiat currencies. (*Id.*)

Citadel Securities has implemented measures protecting its confidential information including, but not limited to: (1) requiring all Citadel Securities employees to sign non-disclosure agreements; (2) requiring all employees to have an electronic access card; (3) restricting Citadel Securities employees from accessing certain floors or areas of the office that they do not need to access to perform their job duties; (4) strictly limiting visitors' access to Citadel Securities' offices; (5) twenty-four hour monitoring of each of its floors via security cameras and security guards; and (6) protecting computer access by user name, password, and privacy tokens, and granting each user only the level of access to Citadel Securities' computer network that is absolutely necessary for that particular user to complete his or her job functions. (*Id.* ¶ 26.)

### B. Defendant's Employment with Citadel Securities

Defendant commenced employment at Citadel Securities in April 2019 as a Business Manager in the company's London office. (*Id.* ¶ 16.) In October 2019, he transferred to the Company's New York office, where he remained until resigning in March 2022. (*Id.*) Prior to joining Citadel Securities, Defendant obtained an undergraduate degree in economics from the London School of Economics in 2010, and an MBA from Harvard Business School in 2017. Between graduating from the London School of Economics and attending Harvard, he worked as a product manager at the London Stock Exchange. After Harvard and before joining Citadel Securities, he worked as an associate consultant at McKinsey & Co. (*Id.* ¶ 17.)

3

FILED DATE: 9/16/2022 3:39 PM 2022CH09197

At Citadel Securities, Defendant worked with sophisticated and highly educated colleagues, and had access to, acquired, and created valuable confidential information that was critical to the company's business. (*Id.* ¶ 18.) In particular, he had access and visibility into Citadel Securities' crypto efforts and strategies. Beginning in the Spring of 2021, Defendant was part of a small team of Citadel Securities employees who researched, analyzed, and evaluated opportunities and strategies for Citadel Securities in crypto, which was an emerging and significant financial space in which the company had a limited presence at the time. (*Id.*) Defendant and this team analyzed options for crypto legal and entity design, funding and operations, tax considerations, business design, staffing, technology, and risk management. (*Id.*) They also evaluated available crypto market data, target crypto exchanges, approaches to working with different crypto exchanges, the crypto product landscape, competitors in crypto, and other topics. (*Id.*)

In May 2021, Defendant helped prepare a presentation on his and his team's crypto efforts that he and others delivered to the CEO and other senior employees of Citadel Securities. (*Id.* ¶ 19.) The presentation covered a broad range of potential crypto opportunities and strategies, and included details about confidential information Defendant and his team had gathered and created during their work, including the names of crypto data providers; detailed data about crypto exchanges, including bid-ask spreads, volume, internal evaluation of advantages and disadvantages of conducting operations in different geographic regions around the world, among other things; in-depth analysis of crypto products, including data on trends and funding rates; evaluations of existing crypto market-makers, including competitors; key considerations for entity design, including regarding different approaches to structure and affiliations; staffing information, including information on current Citadel Securities employees

4

who had prior crypto experience before joining the company; and other information. (*Id.*) In the months that followed, Defendant oversaw the selection and implementation of various crypto opportunities and strategies discussed in his May 2021 presentation. (*Id.* ¶ 20.)

In connection with his hiring and as a condition of his employment, Defendant executed a Non-Compete Agreement, Non-Disclosure Agreement ("NDA"), Non-Solicitation Agreement, and Mediation/Arbitration Agreement. (*Id.* ¶ 27.) As part of the Non-Compete Agreement, Defendant agreed that he would not perform similar services for, or serve in a similar role with any competitor of Citadel Securities for a period of up to 15 months. (*Id.* ¶¶ 27–29.) Under this Non-Compete Agreement, Citadel Securities is required to pay Defendant $15,000–$18,000 each month he is restricted from working for a competitor so long as he complies with his obligations under that Agreement. (*Id.* ¶ 27.) Additionally, as part of the Mediation/Arbitration Agreement, Defendant agreed to arbitrate any disputes with Citadel Securities before the American Arbitration Association ("AAA"). However, the Mediation/Arbitration Agreement specifically allows either party to seek a temporary injunction from a "court of competent jurisdiction" to prevent the other party from breaching any agreement until the dispute has been submitted to and resolved by the AAA.

## II. Defendant's Resignation and the Instant Litigation

In January 2022, Defendant informed Citadel Securities that he was resigning his position, and on March 18, 2022, he resigned. (*Id.* ¶¶ 38, 40.) On September 9, 2022, Defendant emailed Citadel Securities that he had joined a new employer, Portofino Technologies. (*Id.* ¶ 41.) Portofino is a competitor of Citadel Securities in the crypto space. (*Id.* ¶¶ 42–43, 45.)

Pursuant to the parties' Mediation/Arbitration Agreement, Citadel Securities filed a mediation request before the AAA on September 16, 2022 seeking redress for Defendant's actions. (*Id.* ¶ 48.) If mediation is not successful, there is a potential for private arbitration with

5

the AAA in Chicago as well. (*Id.*) Citadel Securities requests that this Court enter a temporary restraining order to maintain the status quo through the mediation with the AAA. If the mediation is not successful at resolving the dispute, Citadel Securities will seek either to renew the temporary restraining order or obtain a preliminary injunction, or seek relief in AAA arbitration.

## LEGAL STANDARD

Preliminary injunctive relief such as a temporary restraining order is a "provisional remedy granted to preserve the status quo, pending a hearing on the merits of the case." *Dam, Snell & Taveirne, Ltd. v. Verchota*, 324 Ill. App. 146, 155, 754 N.E.2d 464, 471 (1st Dist. 2001). Under Illinois law, the status quo is the "last, actual, peaceable, uncontested status" before litigation. *Jones v. Dep't of Public Aid*, 272 Ill. App. 3d 184, 193, 867 N.E. 2d 563, 572 (3d Dist. 2007). Temporary restraining orders and preliminary injunctions are appropriate to maintain the status quo pending the outcome of arbitration proceedings. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 215 (7th Cir. 1993); *OptionsCity Software, Inc. v. Baumann*, 2015 WL 3855622, at *2 (N.D. Ill. June 19, 2015) (issuing a temporary restraining order to enjoin solicitation of employer's customers pending arbitration).

Whether to grant a temporary restraining order is within "the sound discretion of the trial court." *Dam, Snell & Taveirne, Ltd.*, 324 Ill. App. at 155, 754 N.E.2d at 471. A party seeking a temporary restraining order must show: (1) it has a protectible interest; (2) it will suffer irreparable harm in the absence of injunctive relief; (3) it has no adequate remedy at law; and (4) a likelihood of success on the merits. *Bartlow v. Shannon*, 399 Ill. App. 3d 560, 567, 927 N.E.2d 88, 95 (2010). However, the movant "is not required to make out a case which would entitle [it] to judgment at trial; rather, [it] need only show that [it] raises a 'fair question' about the existence of [its] right and that the court should preserve the status quo until the case can be

6

FILED DATE: 9/16/2022 3:39 PM 2022CH09197

decided on the merits." *Id*. Here, Citadel Securities has certainly raised a "fair question" sufficient for this Court to enter a temporary restraining order maintaining the "last, actual, peaceable, uncontested status" between the parties (specifically, Defendant not working for Citadel Securities' direct competitor) pending the outcome of the mediation proceeding.

## ARGUMENT

### I. Citadel Securities Has a Legally Protectible Interest

Citadel Securities has a legally protectible legitimate business interest in enforcing the Non-Compete Agreement to protect its confidential information, namely its opportunities and strategies relating to crypto. Illinois law recognizes that a company has a protectible interest in confidential information. *See Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396, 358 Ill. Dec. 322, 325 (2011) (acquisition of confidential information is a factor that should be considered when finding a legitimate business interest in enforcement of a restrictive covenant); *Segerdahl Corp. v. Giovanni*, 2022 IL App (1st) 211610-U ¶ 34 (employer seeking injunction had a "clearly ascertained right in need of protection by virtue of its legitimate business interest in protecting its confidential information"). "Confidential information" is information that an employer has that is not generally known to competitors and provides the employer with a competitive advantage. *The Agency, Inc. v. Grove*, 362 Ill. App. 3d 206, 216, 839 N.E.2d 606, 615 (2d Dist. 2005).

Here, while employed at Citadel Securities, Defendant became intimately familiar with, and participated in the development and gathering of, confidential information relating to Citadel Securities' crypto efforts, including the names of crypto data providers; detailed data about crypto exchanges, including bid-ask spreads, volume, and internal evaluation of advantages and disadvantages of conducting operations in different geographic regions around the world, among other things; in-depth analysis of crypto products, including data on trends and funding rates;

7

evaluations of existing crypto market-makers, including competitors; key considerations for entity design, including regarding approaches to structure and affiliations; staffing information, including information on Citadel Securities employees who had prior crypto experience before joining the company; and other information. Further, as discussed in detail above, Citadel Securities has implemented extensive measures to ensure that its confidential information is not disclosed outside of Citadel Securities (including to its own investors). Thus, Citadel Securities has a protectible interest in its confidential information related to its crypto efforts.

## II. Citadel Securities is Likely to Succeed on the Merits of Its Claim

Citadel Securities is likely to succeed on the merits of its breach of Non-Compete Agreement claim because Defendant has accepted employment with Portofino, a direct competitor with Citadel Securities in the crypto space. Defendant assented to the Non-Compete Agreement in entering into his employment agreement that was supported by adequate consideration, and has waived his right to contest the enforceability of the Non-Compete Agreement. Indeed, Defendant's separation/release agreement with Citadel Securities explicitly stated that "[b]y signing . . . you also release, waive and covenant not to assert any claim or contention that any provision of . . . [the Non-Compete Agreement] is unreasonable, invalid, unlawful or unenforceable." (Compl. ¶ 40.) Moreover, even if Defendant could challenge the terms of the Non-Compete Agreement, the restrictions in that agreement are enforceable.

### A. The Non-Compete Agreement Is Enforceable.

Under Delaware law,[1] a covenant not to compete in a valid employment agreement is enforced if (1) "its purpose is to protect the legitimate interests of the employer" and (2) "its duration is reasonably limited temporally and its scope is reasonably limited geographically."

---

[1] Delaware law is the chosen law of the parties and governs the Non-Compete Agreement. (Compl. ¶ 8.)

8

*MQ Assocs. V. N. Bay Imaging, LLC*, 2007 WL 2566022, at *3 (N.D. Fla. Aug. 31, 2007) (Delaware law) (citing *McCann Suveyors, Inc. v. Evans*, 611 A.2d 1, 4-5 (Del. Ch. 1987)).[2]

Citadel Securities has a legitimate interest in protecting itself form a former employee's use of its confidential information against it. Where "valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair," the employer has a legitimate economic interest at stake and the provision is "likely to be specifically enforced." *McCann*, 611 A.2d at 4.

Additionally, the time and geographic restrictions are reasonable. The reasonableness of the duration is "based on the nature of the employee's position and the context of a particular industry." *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *14 (Del. Ch. 2002) (holding two-year duration reasonable time restriction). Here, the duration of the non-compete provision is limited to 15 months (it has been less than 6 months since Defendant left the company, with less than 10 months left to run on the non-compete). This time period is tailored to prevent Defendant's competitive use of the confidential information he gained from his employment with Citadel Securities. *See also Zabaneh Franchises, LLC v. Walker*, 2012 IL App (4th) 110215 ¶ 21, 972 N.E.2d 344, 350 (4th Dist. 2012) (enforcing a non-competition agreement with a two-year time restriction); *Gillespie v. Carbondale & Marion Eye Ctrs., Ltd.*, 251 Ill. App. 3d 625, 629, 622 N.E.2d 1267, 1270-71 (5th Dist. 1993) (same).

Likewise, the geographic scope of the agreement is reasonable. Where, as here, the employer's business "extends throughout the nation, or indeed even internationally," a non-competition agreement with no geographic limitation can be enforceable. *Research & Trading*

---

[2] Similarly, Illinois courts will enforce a non-competition agreement if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor, and (2) is not injurious to the public." *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396, 358 Ill. Dec. 322, 325 (2011).

9

*Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. 1992); *see also Instrumentalist Co. v. Band, Inc.*, 134 Ill. App. 3d 884, 895, 480 N.E.2d 1273, 1281 (1st Dist. 1985) (enforcing a non-competition agreement that contained a nationwide geographic restriction where the plaintiff company's activities were national in scope); *Zabaneh Franchises, LLC*, 972 2012 IL App (4th) 110215 ¶ 22, N.E.2d at 350 (finding geographical restrictions unnecessary to enforce non-compete agreement). Indeed, the Citadel Securities personnel that worked on crypto were spread across the company's offices and regions. Moreover, Defendant acknowledged in the Non-Compete Agreement that he understood that Citadel Securities' business is global in scope and the he understood "the need for the restrictions in this Agreement to be without limitation as to location."

In assessing the enforceability of a non-competition agreement, Illinois courts also consider the hardship to defendant and the effect upon the general public. *See Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d at 396. Here, Defendant will not experience any hardship if the Non-Compete Agreement is enforced because the Non-Compete Agreement provides that Citadel Securities will pay Defendant $15,000–18,000 per month if he abides by its terms. The Non-Compete Agreement is also not contrary to the public interest and has no effect on the general public because it was entered into by two private parties and does not injure the public. *See Menasha Packaging Co, LLC v. Pratt Indus., Inc.*, 2017 WL 639634, at *7 (D.N.J. Feb. 15, 2017) (applying Illinois law) (no likely injury to the public when enforcing restrictive covenant in a "highly competitive industr[y]," particularly "where the public [is] still free to seek the services of the employee's new employer"); *see also City of Chicago v. Chicago Fiber Optic Corp.,* 287 Ill. App. 3d 566, 573, 678 N.E.2d 693, 698 (1st Dist. 1997) ("Public policy strongly favors the freedom to contract."). Additionally, the public interest is served by non-competition

10

agreements "necessary to protect one party from injury by the unfair use of the subject-matter of the contract by the other party." *First Health Group Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 229 (M.D. Pa. 2001) (applying Illinois law) (quoting *Union Trust & Sav. Bank of E. St. Louis v. Kinloch Long-Distance Tel. Co. of Mo.*, 258 Ill. 202, 101 N.E. 535 (1913)); *Menasha*, 2017 WL 639634, at *11 ("Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships.").

### III. Citadel Securities Will Suffer Irreparable Harm and Has No Adequate Remedy at Law

If Defendant is permitted to misappropriate and use Citadel Securities' confidential information, money damages would be insufficient to compensate Citadel Securities and the harm would irreparable. Where, as here, a former employee violates enforceable restrictive covenants, "ongoing competition itself [is] a sufficient basis" to find irreparable harm. *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 272, 880 N.E.2d 188, 198 (4th Dist. 2007); *see also Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 74, 589 N.E.2d 640, 648 (2d Div. 1992) ("Once a protectable interest is established, irreparable injury is presumed to ensue if the interest is not protected."). Indeed, no adequate remedy at law exists because "loss of competitive position is intangible, incapable of being measured." *A-Tech Computer Servs., Inc. v. Soo Hoo*, 254 Ill. App. 3d 392, 401, 627 N.E.2d 21, 27 (1st Dist. 1993); *see also IDS Fin. Servs., Inc. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994) (holding that "[w]here trade secrets . . . are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable."). Thus, legal remedies alone cannot sufficiently redress the harm Defendant has inflicted and will inflict upon Citadel Securities, and Citadel Securities is entitled to an injunction to prevent those injuries.

FILED DATE: 9/16/2022 3:39 PM 2022CH09197

**CONCLUSION**

For these reasons, Citadel Securities respectfully requests that the Court grant Citadel Securities' Motion for a Temporary Restraining Order and enjoin Defendant from employment at Portofino to maintain the status quo through the mediation with the AAA. If the mediation is not successful at resolving the dispute, Citadel Securities will seek either to renew the temporary restraining order or obtain a preliminary injunction, or seek relief in AAA arbitration.

Dated: September 16, 2022

Respectfully submitted,

CITADEL SECURITIES AMERICAS SERVICES LLC

By: /s/ Adam L. Hoeflich

One of Its Attorneys

    John Dickman
    **OGLETREE, DEAKINS, NASH,**
    **SMOAK & STEWART, P.C.**
    155 North Wacker Drive, Suite 4300
    Chicago, Illinois 60606
    (312) 558-1255
    Firm ID No. 37976

    Daniel D. Rubinstein
    Christopher Y. Lee
    **SIDLEY AUSTIN LLP**
    One South Dearborn
    Chicago, Illinois 60603
    (312) 853-7000
    Firm ID No. 42418

    Adam L. Hoeflich
    **BARTLIT BECK LLP**
    54 West Hubbard Street
    Chicago, IL 60654
    (312) 494-4400
    Firm ID No. 31210

    *Attorneys for Plaintiff*

FILED DATE: 9/16/2022 3:39 PM 2022CH09197