**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CITADEL SECURITIES AMERICAS SERVICES LLC, | |
| Plaintiff, | Case No. 1:22-cv-05185 |
| v. | |
| VINCENT PRIEUR, | Judge John F. Kness |
| Defendant. | |

**DEFENDANT'S VERIFIED IN OPPOSITION TO PLAINTIFF'S EMERGENCY**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

Plaintiff Citadel Securities Americas Services ("Citadel") seeks the extraordinary and unjustified remedy of enjoining Defendant Vincent Prieur ("Prieur") from working for his new employer, Portofino Technologies Ltd. ("Portofino"), in Switzerland. As explained *infra*, Citadel's Motion for Temporary Restraining Order (the "Motion") should be denied for at least three (3) principal reasons: (i) Citadel has not established that it has a legitimate business interest in need of protection vis-à-vis Prieur's work with Portofino, (ii) Citadel's Non-Compete Agreement is overbroad and unenforceable relative to its claim against Prieur, and (iii) in all events, Prieur has not breached and is not breaching the terms of the Non-Compete Agreement.

## I.    FACTUAL BACKGROUND

### A.    The Non-Compete Agreement … And Its Actual Standard To Be Applied

On September 26, 2019, Citadel and Prieur entered into a Non-Compete Agreement and a Mediation/Arbitration Agreement. (Cmplt., ¶¶ 27-28, Exs. A-B thereto.) The Non-Compete Agreement prohibits Prieur from "directly or indirectly" engaging in any "Competitive Activity," for fifteen (15) months after the termination of his employment with Citadel. (Cmplt., Ex. A, ¶ 1.)

"Competitive Activity" is defined as "becoming an employee . . . of a Competitive Enterprise in a capacity . . . where there is a reasonable possibility that [he] may, intentionally or inadvertently, directly or indirectly, use or rely upon Confidential Information" or "**in a capacity** that is similar to the capacity [he] was in, where [he] provide[s] services that are similar to the services [he] provided, or with responsibilities that are similar to the responsibilities [he] had . . . during the final 24 months [he] was employed at Citadel[.]" (Cmplt., Ex. B, ¶ 7; emphasis added.) Thus, under Citadel's own documentation, there is not an outright ban on engagement by a purported competitor; rather, such engagement might be claimed as objectionable only if it the engagement actually is "**in a capacity**" competitive with Prieur's work with Citadel. *Id.* As addressed below, Citadel has not even addressed this controlling definition / standard from its own documents, let alone demonstrated that it is likely to succeed ultimately on its claim in this regard.

### B.  Citadel And Its Employment Of Prieur

Citadel characterizes itself as a market-making firm focused on fixed income and equity financial products, including for retail and institutional clients. *See* Plaintiff's Verified Complaint at ¶ 13. Prieur began his employment with Citadel in April 2019 as a Business Manager in Citadel's London Office. (*Id.*, ¶ 16.) In October 2019, Prieur transferred to Citadel's New York office. (*Id.*, ¶¶ 2, 16.) Prieur provided advanced notice of his resignation, in January 2022; he then stayed on with Citadel through his agreed-upon final day, March 18, 2022. (*Id.*, ¶¶ 38-39.)

For his first two-and-a-half years at Citadel, Prieur's primary focus was on the equity options space.[1] Thereafter, Primeur transitioned to focus on low latency trading of equity, futures, and options. In neither of these roles did Prieur have any responsibility whatsoever for any crypto-currency-related matters. Furthermore, even within the roles he did hold, Prieur did not have

---

[1]  This factual representation, as with all other fact statements set forth in this Opposition Brief, have been verified under oath by Mr. Prieur, by way of the Verification page attached hereto as Exhibit A.

access to any of Citadel's source codes, pricing formulas, information relating to the functioning of algorithms, or any other formula or code used to generate revenue. Indeed, it is important to underscore that Primeur was not and is not a technical expert; he does not know how to code, he does not trade…indeed, he does not do any of the "market making" Citadel claims as its business.

### C. Prieur's Cryptocurrency Involvement…Or More Accurately, Lack Thereof

Citadel alleges that, in March 2021, Prieur was assigned to a team of Citadel employees which "researched, analyzed, and evaluated opportunities and strategies for Citadel Securities in crypto . . . ." (Compl., ¶ 18.) This team assignment was separate and distinct from Prieur's daily responsibilities and was Prieur's first time working in the crypto space. As Citadel concedes in its own Complaint, the team "evaluated *available* crypto market data, target crypto exchanges, approaches to working with different crypto exchanges, the crypto product landscape, competitors in crypto, and other topics." (*Id.*, ¶ 18 (emphasis added)). Cutting through Citadel's cryptic description, Prieur simply was tasked with reviewing *publicly-available* information, published openly by public exchanges, regarding the procedural mechanisms for registering to trade cryptocurrencies on those exchanges. Prieur did not (for example) consider or present any strategies on *how* Citadel should trade cryptocurrencies, or *what* clients or methodologies should be considered, or anything of the sort. Indeed, as Citadel again admits in its own Complaint, in a single PowerPoint presentation in May of 2021 – *i.e.* a **year-and-a-half** ago now – Prieur and his teammates identified "names of crypto data providers" and "data about crypto exchanges." *Id.*, ¶ 19. This referenced information was simply a summary of publicly-published information by various exchanges; it was a mere compilation of data available at the time for review by any person or entity in the world who chose to review information about the various exchange details. Prieur obtained the crypto-exchange information he contributed to the PowerPoint by reviewing publicly-available Internet websites and resources.

-3-

Citadel also cites the PowerPoint presentation as covering some "key considerations for entity design, including regarding different approaches to structure and affiliations." *Id*. What Citadel really is alleging here is that the PowerPoint addressed the fact Citadel is a US-based entity and that Citadel necessarily would consider the functional aspect of registering on a foreign exchange where cryptocurrencies are traded. This rudimentary consideration – *i.e.* for purposes of complying with exchange registration requirements – is Citadel-specific and presents no "competitive advantage" to Portofino, which is a foreign company ***already*** registered to conduct foreign trading in a manner specific to Portofino's own unique ownership structure and operations.

Finally, Citadel attempts to paint its allegations with a broader brush in the Complaint, going on to allege generically that the early 2021 PowerPoint presentation purportedly made reference to some undefined "range of potential crypto opportunities and strategies" and some "in-depth analysis of crypto products." *Id*. Citadel fails to articulate, however, what it means by these generic phrases, relating to a mere PowerPoint presentation that is some eighteen months stale now. *Id.*. Indeed, the undersigned counsel has requested that Citadel produce this PowerPoint – the very lynchpin of its case – for review by the Court. (*See* Exhibit B hereto.) But Citadel has refused to do so, even on an attorneys-eyes-only basis. *Id.* Thus, Citadel has provided this Court with no actual evidence regarding the generic PowerPoint reference that is the very crux of Citadel's own claim. Citadel's failure to produce the document – or *any* other evidence in support of its drastic injunction request – is not surprising, as the facts show that Prieur did not create or possess any proprietary information that might possibly warrant an injunction against him.

With respect to the evolution of Citadel's own crypto considerations, Citadel glosses over the fact that in late summer of 2021 Citadel made the decision to transfer its cryptocurrency initiative out of the US and into its Asian offices, where an entirely new and separate designated

-4-

team *in Asia* led (and is continuing to lead) Citadel's efforts to explore and pursue any crypto-currency business divisions from that point forward. *Id.* at ¶ 22. Prieur did not relocate to Asia to remain a part of that team, and his involvement (such as it was) in Citadel's "crypto operations" then effectively was reduced to 0% of his working time.

No doubt mindful of this obvious factual gap in its own allegations and claims, Citadel attempts to spin a simple congratulatory note that Prieur later sent to the Asian office, apparently to suggest that such "congratulations" somehow must equate with Prieur's own work on the project. *Id.* Citadel's very reliance on this "congratulations" note – without setting forth any evidence or facts regarding any work Citadel might claim Prieur actually did on the Asian-based project – speaks volumes about the void of actual allegations against Prieur. Those facts actually alleged by Citadel make clear that Prieur simply did not have a role in the Asian-team's efforts. For example, Citadel admits in its Complaint that on March 14, 2022 "**Citadel Securities'** *affiliate* **in Asia**" succeeded with their work and executed their first trade.[2] *Id.* Prieur did not work for that affiliate (whatever it is). Prier was not involved in any coding, or trading strategies, or any such details, all of which (whatever they might have been) were handled exclusively by the separate team in Asia. Prieur "congratulations" note to a separate team half-way around the world for that team's independent work on achieving an objective does not equate somehow with Prieur's own involvement in whatever assertedly proprietary work that Asian team created and implemented. Citadel has failed to assert substantive allegations in its Complaint to link Prieur's generic involvement with the May, 2021 team PowerPoint presentation to the undefined Asian affiliates' execution of a cryptocurrency trade some fourteen (14) months later. *Id.* ¶¶ 19-22.

---

[2] Notably, Citadel glosses over the fact that some undefined "affiliate" was responsible ultimately for the cryptocurrency initiative in Asia, (*Id.* ¶ 22); Citadel never makes any allegations to link up that unknown "affiliate" with Prieur's separate engagement in the US or under the restrictive covenant documents' definitions and provisions.

### D.    Prieur's Resignation from Citadel in January 2022

In January 2022, Prieur informed Citadel that he would be resigning his employment, *id.*, ¶ 38, as he wished to return home to Europe.  Citadel asked Prieur to remain on for another two to three months in order to to train his replacement, and Prieur agreed to do so.[3]  Prieur stayed on until March 18, 2022.  *Id.*, ¶ 40.  Contrary to Citadel's apparent suggestion that Prieur's resignation in March might be suspect because his resignation occurred "four days after Citadel Securities' first systematic crypto trade," *id.*, ¶ 4, Prieur did not have responsibility for such trading (again, the Asian team did), and Prieur would have resigned months earlier but for Citadel's request that he stay on for transition of his *other* (*i.e. non*-crypto) work duties within the company.

### E.    Prieur's Employment at Portofino

Prieur's current employer, Portofino, is a technology company based in Zug, Switzerland. Established in 2021, Portofino provides liquidity for digital assets.  Portofino uses its own proprietary technology which leverages advanced machine learning and control techniques to provide its clients and partners with the best pricing in the market.  Due in part to its innovative technology, in the year since its inception, Portofino has traded billions of dollars across cryptocurrency exchanges; and such operations and active crypto trading by Portofino occurred long before Prieur's engagement there.  Whereas Citadel asserts that it is a "market maker" for fixed income and equity financial products in the United States, Citadel admits that "Portofino is a market-making firm for cryptocurrencies based in Zug, Switzerland."  Cmplt., ¶¶ 13, 42.  Prieur is engaged by Portofino in an operational role only, and is not responsible for the technical aspects

---

[3] While Prieur did agree to this transition period, the "Transition Bonus" referenced in Citadel's Complaint (Cmplt., ¶ 39) was in relation to Citadel's commitment to pay Prieur his bonus payment for past services already rendered in 2021 – *i.e.,* not some additional payment in consideration for his continued employment.

of Portofino's online trading / cryptocurrency business. Prieur is not using or disclosing any Citadel documentation or any of its assertedly proprietary information.

### F. Citadel's Separate and Ongoing Arbitration in London

Notably absent from Citadel's TR Motion is discussion of the ongoing litigation between Citadel and Portofino's founders.[4] In that arbitration, Citadel is pursuing broad clams relating to the formation and operation of Portofino. (*See e.g.* Citadel's Request for Arbitration, attached hereto as <u>Exhibit C</u>). Rather than incorporate and address its allegations against Prieur into that overarching dispute, Citadel has filed this injunction request against non-US-citizen Prieur here in Chicago. Citadel's attempt to isolate Prieur in litigation and proceed against him individually in the United States – when there is no factual or legal basis to do so, as set forth above and addressed below – can be seen for what it is: Citadel's attempt to divide and conquer, bogging down Prieur (a resident of Switzerland) individually with litigation in Chicago while attempting to attack Portofino as a whole in the ongoing EU proceedings. This is not a justified attempt to protect against actual competitive conduct (which does not exist) or disclosure of confidential information (which is not occurring and is not threatened to occur), much less one requiring issuance of a TRO to put Mr. Prieur out of work and stop him from earning his livelihood.[5]

## II. CITADEL'S TRO MOTION SHOULD BE DENIED

To obtain a temporary restraining order ("TRO"), a movant must prove by clear and convincing evidence that (1) it has a likelihood of success on the merits; (2) traditional legal

---

[4] Citadel merely mentions the following: "Citadel Securities is in a separate legal dispute with Lancia and Casimo [the founders of Portofino]." Cmplt., ¶ 42.

[5] It is noteworthy that Citadel not only requests a TRO to put Prieur out of work, but if that TRO were granted Citadel can assert the parties next must participate in a AAA "mediation conference"; then the parties would need to be assigned an arbitrator within the AAA; or then Citadel (and <u>only</u> Citadel) could opt by unilateral "election" to return the case to Court instead. Cmplt., Ex. 2. Thus, Citadel has structured a framework whereby it can control the forum and timing of the claim proceedings, which would be to the significant detriment of Mr. Prieur if issues were slow-played and bounced between forums and processes, if a TRO preventing Mr. Prieur from working were to be in effect.

remedies would be inadequate; and (3) without the requested relief, it will suffer irreparable harm during the pendency of its action. *Lechliter v. Del. Dep't of Nat. Res. & Env't Control*, 2013 WL 5718888, at *2 (Del. Ch. Oct. 22, 2013). If the movant satisfies these requirements, the court must "consider the balance between the irreparable harm that the moving party will suffer if relief is denied and the harm that the nonmoving party will suffer if relief is improperly granted" and the "interests of non-parties in granting or denying" the TRO. *Id.* In order for its TRO request to be granted, Citadel carries the burden of proof, as it must prove each TRO element by clear and convincing evidence. *All Pro Maids, Inc. v. Layton*, 2004 WL 1877884, at *5 (Del. Ch. Aug. 10, 2004). Even were Citadel to clear this high evidentiary bar, the Court must "consider the balance between the irreparable harm that the moving party will suffer if relief is denied and the harm that the nonmoving party will suffer if relief is improperly granted" and the "interests of non-parties in granting or denying" the TRO. *Id.* A TRO is an extraordinary remedy that should not be granted unless movant, by a clear showing, carries the burden of persuasion. *Trilogy Portfolio Co., LLC v. Brookfield Real Estate Fin. Partners, LLC*, 2012 WL 120201, at *6 (Del. Ch. Jan. 13, 2012).

### A. Citadel Has Not Demonstrated It is Likely to Succeed on the Merits of Its Claim

While Citadel purports to apply its contract(s) against Prieur in order to put him out of work, Citadel cites to *Reliable Fire* and other Illinois caselaw when purportedly describing the "protectible interest" standard and the supposed corresponding burden of proof which Citadel must meet in order to "make out a case" for purposes of its TRO. *See e.g.* Plaintiff's Memorandum of Law In Support of Its Emergency Motion for Temporary Restraining Order (the "TRO Memo"), at pp. 6-7. In doing so, Citadel disregards its own contract terms, which identify Delaware as

controlling law; Citadel does not even reference Delaware law until later in its brief (and then, via footnote). *Id.* p. 8. Citadel is not entitled to a TRO under Delaware law.[6]

### 1.      Citadel Has Not Demonstrated Violation of Any Enforceable Covenant

"Delaware courts do not mechanically enforce non-competes." *FP UC Holdings, LLC v. Hamilton,* 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020) . Under Delaware law, a covenant not to compete is enforceable only if: (1) it adheres to the general principles of contract; (2) it is reasonable in scope and duration; (3) it advances the legitimate economic interests of the party enforcing the covenant; and (4) it survives a balance of the equities. *Tasktop Techs. US Inc. v. McGowan*, 2018 WL 4938570, at *5 (D. Del. Oct. 11, 2018); *CBOT Holdings., Inc. v. Chi. Bd. Options Exch., Inc*., 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007). When assessing reasonableness, the Court focuses on whether the non-compete is "essential for the protection of the employer's economic interests" which have been proven to be at issue. *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998). Where, as here, a non-compete is "contained in an employment contract as opposed to contracts for the sale of business" it is subject to greater scrutiny. *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 465 (Del. Ch. 1977).

### a.      Citadel Fails to Demonstrate a Threatened Protectable Interest

Delaware law has recognized "protection of employer goodwill and protection of employer confidential information from misuse" as economic interests which might justify enforcement of a non-compete. *See Elite Cleaning Co. v. Capel*, 2006 WL 1565161, at *8 (Del. Ch. June 2, 2006). Citadel makes the conclusory allegation that it "has a legally protectible legitimate business interest in enforcing the Non-Compete Agreement to protect its confidential information, namely its opportunities and strategies relating to crypto." TRO Memo, at p. 7.

---

[6] Lest there be any doubt, Prieur also maintains Citadel would not be entitled to a TRO under Illinois law either.

34373778.6

However, Citadel has not carried (and could not carry) its burden of proving that a TRO is warranted in order to protect any such purported "confidential information." Specifically, Citadel has not nearly demonstrated that the rote listing of information categories in Paragraph 19 of the Complaint pertains to any actual confidential information <u>or</u> that Prieur is threatening to use any of it (even it were). Indeed, as set forth above, Citadel has refused to produce for this Court's (or counsel's) review even a copy of the early-2021 PowerPoint presentation on which Citadel has built its case. *See* Ex. B (counsel email). And with good reason: that 2021 PowerPoint principally would reflect (i) Prieur's review of *publicly-available* information regarding foreign exchanges' registration procedures (data which by definition is not "confidential"), or (ii) consideration of registering on the foreign exchanges vis-à-vis Citadel's US-based entity status (data which by definition is irrelevant and poses no threat of "disclosure" to Portofino, an established <u>non-US</u> entity with operations that already had commenced long ago). There is no actual, identifiable "confidential information" of Citadel which is subject to any urgent, threatened "misuse." *Elite*

Furthermore nearly a year-and-a-half now has passed since the referenced PowerPoint. The Court should not rely on Citadel's unsupported characterization of the "confidential" nature of that early-2021 presentation and then speculate about whether and how it might pertain to Prieur's work in Europe with Portofino today; Citadel cannot just "claim it is so" and then put Prieur out of work. Citadel bears the burden of proof, and Citadel has not even presented the obvious and best evidence – a single PowerPoint presentation – which would serve to prove the very allegations in its own Complaint; Citadel's generic references do not suffice for its TRO request. *See, e.g., WebMD Health Corp. v. Martin,* 2006 824 N.Y.S.2d 767 (Sup. Ct.) (Delaware law) (plaintiff's similar "conclusory statements and heavily redacted emails" provided "little indication" of what protectable business strategies or plans defendant former-employee may have

-10-

acquired.) Indeed, as the *Martin* court addressed, WebMD could not obtain an injunction against a former high-ranking employee (contrasted to Prieur's low ranking with Citadel here) based on WebMD's broad-stroke assertions regarding the former employee's supposed "knowledge of [its] confidential and trade secret information" which that employed obtained through her participation "in daily business meetings, which included discussions of plans to redesign WebMD's website and website content . . . business and strategic planning for technology, growth and expansion, marketing, and advertising." *Id.* at \*19. So too is the case here. Indeed, WebMD submitted significantly more detailed information and evidence than what Citadel has mustered here: namely, generic references to broad categories of purported information, contained only within a couple of Complaint paragraphs. *Id.; compare* Cmplt, ¶ 19. Furthermore, and critically, Citadel has made ***no allegation that Prieur took any documents or information***, or that he has ever attempted to use any documents or information in connection with his engagement with Portofino. *See* Cmplt.

Finally, Citadel fails to explain how information obtained a year and a half ago regarding the crypto market (which can change daily) is even valuable or relevant today, let alone a threat of imminent and irreparable harm due to Prieur's employment in Europe for a European firm. *See Mitchell Lane Publrs., Inc. v. Rasemas,* 2014 Del. Ch. LEXIS 194 (Del. Ch. Sep. 30, 2014) (injunction denied where "[b]y now, the confidential information in those plans is stale and possession of it is of no future value nor poses any threat of irreparable injury").

### b. The Non-Compete Agreement is Overbroad

A covenant not to compete which is "not reasonably limited geographically" is "unreasonable and unenforceable." *Caras v. Am. Original Corp.*, 1987 WL 15553, at \*2 (Del. Ch. July 31, 1987); *FP UC Holdings, LLC v. Hamilton, 2020 WL 1492783, at \*6-7 (Del. Ch. Mar. 27, 2020)* (court will readily decline to enforce covenant if the employer overreaches "by imposing an obviously overbroad" restriction on employee's ability to seek employment after separation).

-11-

Delaware courts have held that the lack of a geographic scope "alone" can be sufficient to find a non-compete unenforceable. *Caras*, 1987 WL 15553, at *2; *Tasktop Techs.*, 2018 WL 4938570, at *5-6 (non-compete unenforceable where it prohibited employee from working anywhere in world). Prieur's Non-Compete Agreement contains no geographic scope, and Citadel offers no explanation as to how his work in Switzerland is affecting Citadel's crypto trading in Asia.[7]

### 2. Citadel Has Not Even Alleged Actual Breach of the Non-Compete

Even were the Court to assess application of the Non-Compete clause, Citadel must prove that Prieur is an employee at a "Competitive Enterprise," and that he currently is relying upon Citadel's confidential information or that he is working "*in a capacity that is similar to the capacity [he] was in . . . during the final 24 months [he] was employed by Citadel*." (Cmplt., at Ex. 1, ¶1; and Cmplt., Ex. 2, ¶7.) (emphasis added). Notably, Citadel fails to demonstrate or even allege that Prieur is breaching the Non-Compete Agreement by any "competitive capacity" actions.

### a. Citadel Has Not Shown That Prieur Possesses its Confidential Information or that Prieur has Threatened to "Use Or Rely Upon" its Confidential Information

Courts refuse to grant a TRO unless the movant can carry its burden and then show that it is clear "that the former employer is suffering substantial harm." *McCann Surveyors, Inc*., 611 A.2d, 4 (1962). As explained, *supra*, Citadel has asserted solely unsupported generalizations about its so-called "confidential information" which Citadel would like this Court to believe must, in fact, actually be "confidential." Citadel (at best) has pointed to an early 2021 PowerPoint with

---

[7] Citadel also spends nearly the entirety of its argument on this point citing to Illinois law, noticeably failing to cite to applicable Delaware law, despite its own contract terms that Delaware law governs the Non-Compete Agreement. The sole case invoking Delaware law which Citadel cites (*Rsch. & Trading Corp. v. Pfuhl,* 1992 WL 345465 (Del. Ch. Nov. 18, 1992)) differs greatly from Prieur's circumstances. (*See* TRO Memo, p. 10.) In *Pfuhl*, the covenant at issue prevented the former employee from dealing with the plaintiff's customers. 1992 WL 345465. Here, Citadel seeks to enforce a Non-Compete which Citadel claims would prevent Prieur from maintaining employment anywhere in the world.

supposedly confidential information regarding Citadel's possible market-**entry**. Again, this information is irrelevant to Portofino, an already established EU firm was actively in operations in 2021 (well before Prieur joined the company). *See, e.g.*, *Mitchell Lane Publrs.,* 2014 Del. Ch. LEXIS 194 (preliminary injunction denied where "[b]y now, the confidential information in those plans is stale and possession of it is of no future value nor poses any threat of irreparable injury."). Because Citadel cannot show that it is seeking protection of any identified, actual "confidential information," and also because Citadel has not carried its burden of showing how Prieur may be relying on any such information, Citadel is not entitled to a TRO. *See, e.g., Lewmor, Inc. v. Fleming*, 1986 WL 1244, at*3 (Del. Ch. Jan. 29, 1986) (denying TRO, as defendant was "not using any proprietary information of plaintiff in his new employment"); *UtiliSave, LLC v. Miele*, 2015 WL 5458960, at *9 (Del. Ch. Sept. 17, 2015) (it is "not a breach simply to know… information").

> **b.** **Citadel Has Not Shown that Prieur is Working at Portofino in the Requisite "Capacity Similar" to his Work at Citadel**

Even if Prieur were to accept Citadel's allegations on their face (which Prieur does not do), Citadel's allegations fall far short of proving the requisite "*competitive capacity*" actions and threat by Prieur as required under Citadel's own, controlling contract definition. (Cmplt., at Ex. 1, ¶1; and Cmplt., Ex. 2, ¶7.) (emphasis added). Citadel admits that Prieur's involvement in Citadel's "crypto opportunities and strategies" occurred in May 2021. (*See* Cmplt., ¶ 19.) Using vague generalities, Citadel then devotes all of two sentences to claiming that Prieur was involved in "the selection and implementation of various crypto opportunities and strategies" in the "months that followed." (*Id*, ¶ 20.) Citadel does not provide any facts or details supporting its overarching, generic allegations; nor could Citadel do so. Despite Citadel's effort to paint Prieur as some mastermind of Citadel's crypto plans, he was anything but. He did <u>not</u> implement the planning,

nor he does not know how to write algorithms, code, or engage in any technical work whatsoever or plan for crypto (or any) trading.

Furthermore, there is good reason Citadel's description of the timeline does not go beyond the early months of 2021: after that point, as described above, Citadel's crypto planning operations were centered out of its <u>Asian</u> offices, and Prieur was not a part of that team of 15+ individuals who worked around the clock on Citadel's efforts. Prieur was a distant bystander who did not have the day-to-day responsibility or insight regarding Citadel's decisions to pursue (or not) any crypto-related endeavors, let alone how such decisions, structure, applications, and the like might have been implemented (or not) by Citadel. Again, Prieur's initial assessment of <u>public</u> information about crypto exchanges in early 2021 was principally focused on how Citadel – as a U.S. owned company – might participate in foreign exchanges, based on the publicly-available information those exchanges provided. Such analysis not only focused exclusively on public data, available to any person/entity, but is also is wholly irrelevant to Portofino, an EU company which already was registered and working on crypto exchanges six (6) months before Citadel even traded its first cryptocurrency. Such Citadel issues are, by definition, irrelevant to Portofino. There is no "competitive capacity" whatsoever at issue with Prieur's engagement by an already established and successful European firm. *See, e.g.*, *Take-A-Break Serv., Inc. v. Grose*, 1990 WL 67392, at *5 (Del. Ch. May 14, 1990) (refusing to enforce non-compete where plaintiff had no legitimate interest in preventing defendant from working for a competitor in a noncompetitive capacity); *Norton Petroleum Corp.*, 1998 WL 118198, at *3 ("Defendant will not be barred from working for any company whose business is 'similar to' [Plaintiff's]. Such a broad, vague and unwieldy restriction given the nature of the industry would work an undue hardship to Defendant . . . .").

-14-

It is remarkable Citadel never once attempts to address its own "competitive capacity" Non-Compete definitional threshold. Instead, in an obvious effort to gloss over this definitional roadblock for its own claims, Citadel devotes two paragraphs of the Complaint playing up its quotation of selective snippets of Prieur's 2021 self-review performance assessment and his congratulatory note to those who were *actually* involved in the initial trading of crypto beginning "March 14, 2022, [by Citadel's] affiliate in Asia." Citadel hardly can secure a TRO to put Prieur out of work on the grounds that he claimed in 202**1** to have done a good job when he was asked to gather *public* information about the crypto exchange rules back then. Nor can his congratulatory note to those who actually worked on the crypto implementation – which Prieur <u>did</u> <u>not</u> <u>do</u> – in Asia be construed as some damming admission against him, let alone does it demonstrate that he must be in some unlawful "competitive capacity" now. Quite the contrary. At best, and although not supported by evidence itself, Citadel has claimed that Prieur "lead[] CitSec's ***foray*** into crypto." (See Cmplt., ¶ 21). Even if the Court were to accept such an assertion on its face (which it should not), that very same assertion sinks Citadel's TRO request. Namely, Prieur most certainly is not operating in the "competitive capacity" Citadel must prove to advance its claim: there is no "foray" into crypto to be pursued with Portofino, as Portofino already had commenced its own independent "foray" – and actually engaged in the business – long before Citadel entered the field.

Finally, to "maintain the status quo" – as Citadel admits should be the touchstone (TRO Memo, p. 6) – means Prieur continuing employment with Portofino while the parties litigate the dispute. *See FP UC Holdings, at* *6 ("a court of equity will not enforce a non-compete if, on balance, to do so would impose an unusual hardship on a former employee.")*; ExamWorks, Inc. v. DeStefano*, 2014 WL 4804790, at *3 (Del. Ch. Sept. 26, 2014) (denying TRO barring former executive from working for competitor where doing so would "put [defendant] out of work").

34373778.6

Dated: September 26, 2022                            Respectfully submitted,

**VINCENT PRIEUR**

/s/ William J. Tarnow
William J. Tarnow (wtarnow@nge.com)
Chad W. Moeller (cmoeller@nge.com)
Alissa J. Griffin (agriffin@nge.com)
Kathleen E. Okon (kokon@nge.com)
NEAL, GERBER & EISENBERG LLP
2 N. LaSalle St. Suite 1700
Chicago, IL 60602
Phone: (312) 269-8000
*Attorneys for Defendant*

-16-

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he caused a copy of the foregoing

**Defendant's Verified Memorandum in Opposition to Plaintiff's Emergency Motion for**

**Temporary Restraining Order** to be served upon the following:

| | | |
|---|---|---|
| Daniel D. Rubinstein | Adam L. Hoeflich | John M. Dickman |
| Christopher Y. Lee | **BARTLIT BECK LLP** | **OGLETREE, DEAKINS,** |
| **SIDLEY AUSTIN LLP** | Courthouse Place | **NASH, SMOAK &** |
| One South Dearborn Street | 54 West Hubbard Street | **STEWART, P.C.** |
| Chicago, Illinois 60603 | Chicago, Illinois 60654 | 155 N. Wacker Dr., |
| (312) 853-7000 | (312) 494-4400 | Suite 4300 |
| Firm ID No. 42418 | Firm ID No. 31210 | (312) 558-1255 |
| | | Firm ID No. 37976 |

via email and electronic filing this 26th day of September 2022.

*/s/ William J. Tarnow*
William J. Tarnow